UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

FRANKLIN SMITH, DEVIN PLUMMER,
BRANDON PANNELL, and CLIFFORD
COLLINS, JR., as next friend of
CLIFFORD COLLINS III,

|  |  |
|---|---|
|  | Case Nos. 07-14034 |
| Plaintiffs, | 08-11019 |
|  | 08-11022 |
| v. | 08-13280 |
|  |  |
| JEFF PATTERSON, *et al.,* | Hon. John Corbett O'Meara |
|  |  |
| Defendants. |  |

_____/

**OPINION AND ORDER GRANTING IN PART
AND DENYING IN PART DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT**

Before the court is Defendants' motion for summary judgment, filed July 5, 2009.  This

matter has been fully briefed.  The court heard oral argument on January 21, 2010, and took the

matter under advisement.

**BACKGROUND FACTS**

Plaintiffs in this § 1983 case are Franklin Smith, Devin Plummer, Brandon Pannell, and

Clifford Collins III.  Each plaintiff brought a separate lawsuit arising out of the same incident; the

court consolidated the cases.  Defendants are the City of Taylor; detectives Michael Lividini, Steven

Schwein, Kenneth May, and John MacDonald; and Corporal Jeff Patterson.  Plaintiffs allege that

they were wrongfully arrested and detained in violation of their Fourth and Fourteenth Amendment

rights pursuant to 42 U.S.C. § 1983.  Plaintiff Plummer also contends that he was coerced into

confessing to a crime he did not commit.

On the night of July 30, 2007, Wendy Meinke was shot and killed outside her home at the Coppertree Apartments in Taylor, Michigan. Earlier that day, Plaintiffs Plummer (age 17), Smith (age 18), Pannell (age 18), and Collins (age 15) spent time playing basketball. That night they drove to the Coppertree Apartments in a silver Saturn. When they arrived, they saw a crowd of people and police activity; they learned that someone had been shot. After a few minutes, they decided to return home. As they were leaving in their vehicle, police stopped them and ordered them to exit the car. All four plaintiffs were arrested and transported to the City of Taylor Police Department.

Earlier that night, Joshua Meinke, a white male, argued with a black male identified as "D-Ron" or "D-Low" outside the Coppertree Apartments. Joshua's mother, Wendy Meinke, intervened and told them to "take that shit somewhere else." D-Ron left and returned with around eight other black males. Shots were fired and Wendy Meinke was struck in the chest and died.

Joshua Meinke called his friends, Mike Perkins and James Payne. When they arrived in a red Blazer, Meinke got in the car and told Perkins to "run them [group of black males] over." As they drove near the group, the Blazer passed a white van. A black male in the van allegedly fired several shots in the direction of the Blazer. Meinke and his friends left the area and flagged down a police officer, Defendant Patterson, near the Telegraph exit of the complex.

As Patterson was talking to Meinke, Perkins, and Payne, the silver Saturn driven by Plaintiff Franklin Smith approached the Telegraph exit. Perkins and Payne pointed out one of the passengers (later identified as plaintiff Devin Plummer) as the person who had shot at them from the white van. Pl.'s Exs. J, K. Meinke described the "other shooter" as a black male wearing a white t-shirt, white basketball shorts, and braided hair. Pl.'s Ex. G. Plummer was wearing a white t-shirt, white basketball shorts, and had short braided hair. See Def.'s Ex. F (interrogation DVD).

2

Taylor police arrested Smith, Plummer, Pannell, and Collins. They were taken to the Taylor Police Department and questioned separately. Smith, Pannell, and Collins were consistent in their responses; they told detectives that they played basketball, were with Plummer all day, and arrived together at the Coppertree Apartments after police were at the scene. These plaintiffs were released from custody after several hours.

Plummer was questioned by Detective Schwein, beginning at about 5 a.m. on July 31, 2007. A video of the interrogation was made and has been provided to the court on DVD. Prior to questioning him, Schwein provided Plummer with a statement of his constitutional rights, which he signed and initialed. Def.'s Ex. E. This statement informed Plummer that (1) he had the right to remain silent; (2) anything he said could be used against him; (3) he had the right to have an attorney present for questioning; (4) a lawyer would be appointed if he could not afford one; and (5) he had the right to stop the questioning at any time to consult with a lawyer. Id.

Schwein determined that Plummer was not high or intoxicated, that he did not need medical attention, that had a 12th grade education, that he was able to read and write, that he was not taking any medication, and that his last meal was at approximately 9 p.m. See Def.'s Ex. F, Ch. 1 (DVD). Plummer was fed during the interrogation and permitted to use the restroom. He was questioned from approximately 5 a.m. to 8 a.m., and again from 11 a.m. to 2 p.m.

Initially, Plummer denied involvement in the shooting and explained that he had arrived at the Coppertree Apartments after the police were already there. Schwein continued to question him, confronting him with witness statements that Plummer had been at the scene. Plummer admitted that he changed his story several times during Schwein's questioning, "'cause I was scared. And when I do tell the truth, I try to have – I try to make a lot of stories for them to make them feel better

so they would stop so I could get out of the situation.  I just made up a lot of stuff." Plummer Dep. at 114.  Schwein did suggest different scenarios to Plummer, including that it was an accident or self-defense.

Plummer first changed his statement to say that he and a group of people had been involved in an argument.  Plummer stated that a white woman attempted to stop the argument and was shot by someone named "Sanchez" Conrad McCombs.  Schwein showed a photographic lineup, including a picture of Santiago Conrad McCombs, to Joshua Meinke.  Meinke said that the person who shot his mother was not in the lineup.  Detectives also determined that McCombs was elsewhere at the time of the shooting.

Schwein confronted Plummer with this information, and Plummer changed his story again. He said that there was an argument; and when the white woman attempted to stop the argument, someone in the group handed Plummer a gun.  Plummer said that the woman startled him and the gun went off two times.  He gave the gun back to the person who gave it to him and ran off on foot, meeting up with his friends in the silver Saturn at a nearby convenience store.  Plummer stated that he and his friends returned to the scene to check on the woman.

Plummer signed a handwritten statement to this effect.  Plummer contends that he was sleep-deprived and emotionally distraught during the two three-hour questioning sessions.  He signed the false confession because he wanted it to end.  He admitted in his deposition that the police "thought the confession was the truth but they thought my – me really telling the truth was a lie, though."

4

Plummer Dep. at 115.  "Then when I told the truth, that's when he got mad. So, that's when I started making all these stories up so he would just get off my back.  And I just feel all right." Id. at 117.[1]

After Plummer confessed, the Schwein submitted a report and warrant request to the Wayne County Prosecutor's Office.  The prosecutor brought murder charges against Plummer, and Smith was charged as an accessory for driving the "getaway" car.  Pannell and Collins were not charged.

About two weeks later, on August 15, 2009, a gunshot residue test that had been performed on Plummer came back negative.  In the meantime, Taylor Police had continued to investigate and speak to other witnesses.  The charges against Plummer and Smith were dropped and two other suspects were ultimately charged and convicted.

## LAW AND ANALYSIS

### I.    Coerced Confession

Plummer contends that Schwein coerced him into making false confession, in violation of his due process rights.  "[C]ertain interrogation techniques are so offensive to a civilized system of justice that they must be condemned under the Due Process clause." Miller v. Fenton, 474 U.S. 104, 109 (1986).  "Whether an interrogation rises to the level of coercion turns on a spectrum of factors: the age, education and intelligence of the suspect; whether the suspect was advised of his *Miranda* rights; the length of the questioning; and the use of physical punishment or the deprivation of food, sleep or other creature comforts." Jackson v. McKee, 525 F.3d 430, 433-34 (6th Cir. 2008).

---

[1] Another example of Plummer's changing stories occurred at his deposition.  Plummer first stated that Schwein chipped his tooth while he was questioning him, and that Schwein "tortured" and "threatened" him.  After he was reminded that he was under oath, Plummer recanted.  Plummer Dep. at 93-97.

5

Plummer was seventeen at the time and had just recently graduated from high school.  He was advised of his *Miranda* rights.  He was questioned in two three-hour sessions, with a three-hour break in between.  He was not denied food and was not prevented from sleeping or using the restroom.  Plummer never told Schwein that he wanted an attorney, wanted the questioning to stop, or that he was too tired to continue.  Plummer was not ill, injured, or under the influence of drugs or alcohol.  He was not threatened or harmed.  A review of the DVD of the interrogation shows that Schwein was calm and professional in his questioning.  Under all of the circumstances, this does not rise to the level of a coerced confession.

In Jackson, the Sixth Circuit found a confession to be voluntary where the seventeen-year-old defendant was given his *Miranda* rights and was interrogated several times over a period of 40 hours, although the questioning did not exceed two and a half hours at a time.  The defendant had argued that he was questioned over a long period of time, he confessed in the early morning hours at the end of the questioning, and he needed special education classes and could read only at a third-grade level.  The court found that "[t]hese circumstances do not rise to the level of involuntary-confession fact patterns that the Supreme Court has condemned." Jackson, 525 F.3d at 434-35 (citing cases).  The examples of circumstances in which a coerced confession were found included (1) officers questioning a suspect for four hours over his objection while he was incapacitated and sedated in an intensive care unit; (2) questioning the defendant for more than 18 hours while depriving him of food, sleep and medication; (3) ordering a wounded defendant at gunpoint to confess or be killed; (4) holding a defendant for four days with inadequate food and medical attention; (5) "systematic" and continuous  questioning of a defendant over five days; and (6)

6

holding the defendant for three days with little food and threatening to expose him to mob violence if he did not confess. Id.

The circumstances surrounding this case, and as presented on the DVD, do not rise to the level of a coerced confession. Plaintiff presents "false confession expert" opinion that the interrogation techniques used by Schwein (and widely used by law enforcement)– isolation, minimization, confrontation, suggesting scenarios – are coercive in themselves. There is no case law to support this argument. Accordingly, the court will grant summary judgment in favor of Defendants on this claim.

## II.    Plummer – False Arrest/Fabrication of Evidence

Plummer also contends that Schwein fabricated evidence in his warrant request, thus supporting a claim of false arrest under the Fourth Amendment. See Adams v. Metiva, 31 F.3d 375, 388-89 (6th Cir. 1994). "Existing case law establishes that a police officer can only be held liable for requesting a warrant which allegedly led to a false arrest if he 'stated a deliberate falsehood or acted with a reckless disregard for the truth. Proof of negligence or innocent mistake is insufficient.'" Ahlers v. Schebil, 188 F.3d 365, 373 (6th Cir. 1999).

Plummer challenges several aspects of Schwein's warrant and preliminary examination testimony as "deliberate falsehoods." See Pl.'s Br. at 13-14. Plummer contends that (1) Schwein claimed that Meinke identified Plummer as the shooter, which Meinke did not; (2) Schwein knew that Perkins and Payne's identification of Plummer was unreliable; (3) Schwein lied to the district judge by testifying that Meinke was "within inches" from the white van when he saw the "other shooter," while Meinke said he was two to three feet away; (4) Schwein failed to inform the prosecutor or judge that Meinke identified "D-Ron" or "D-Low" as the person who shot Wendy

Meinke; (5) Schwein failed to inform the court that he coerced Plummer's confession; and (6) Schwein failed to corroborate Plummer's confession.

None of these issues indicate that Schwein knowingly or recklessly supplied false information to the prosecutor or judge. Schwein turned over his entire file, including Meinke's witness statement identifying "D-Ron" as the shooter, to the prosecutors' office. There is no indication that he was attempting to hide or manufacture evidence. Although Meinke did not identify Plummer as the shooter, his description of the shooter (black male with braids wearing a white t-shirt and shorts) did fit Plummer. Further, Payne and Perkins also identified Plummer at the scene. There is no evidence that Schwein knew or should have known that this identification was unreliable. Moreover, whether Meinke was within "inches" or was two or three feet away from the shooter does not appear to be material.

Even absent the evidence that Plummer claims to have been "fabricated," sufficient probable cause existed for Schwein to seek and obtain an arrest warrant, based upon the eyewitness identification. See Garner v. Grant, 328 Fed. Appx. 325 (6th Cir. 2009) (finding false arrest and malicious prosecution claims to be without merit where, absent the contested evidence, sufficient probable cause existed); Ahlers v. Schebil, 188 F.3d 365, 370 (6th Cir. 1999) (police are entitled to rely on eyewitness identification to establish probable cause).

At most, Plummer's challenges to Schwein's warrant request amount to complaints of negligence, which does not constitute a constitutional violation. See Ghandi v. Police Dept. of City of Detroit, 823 F.2d 959, 963 n.2 (6th Cir. 1987). The court will grant summary judgment in favor of Defendants on Plummer's Fourth Amendment false arrest claim.

## III.   **Smith – False Arrest**

8

Franklin Smith's false arrest claim essentially relies upon Plummer's – Plaintiffs contend that if Plummer had not been wrongfully arrested, then Smith would not also have been arrested and charged as an accessory. As discussed above, probable cause existed for Plummer's arrest, based upon eyewitness identification (even without the allegedly coerced confession). Probable cause also existed for the arrest of Smith, given that he was driving the alleged "getaway" car. Accordingly, Smith's claim for false arrest will also be dismissed.

## IV.   **Pannell and Collins – False Arrest**

Pannell and Collins also have presented claims of false arrest against Corporal Jeff Patterson. In order to prevail on these claims, they must show that he lacked probable cause for their arrests. See Parsons v. City of Pontiac, 533 F.3d 492, 500 (6th Cir. 2008). "A police officer has probable cause only when he discovers *reasonably reliable information* that the suspect has committed a crime." Id. (citation omitted).

Defendants have not demonstrated, as a matter of law, that probable cause existed for the arrest of Pannell and Collins at the scene. Although they were in the car with Plummer, no witness identified them as committing a crime and it appears that the police did not have information that either had committed a crime. It is well established that a person's presence at a crime scene does not, in itself, establish probable cause. Harris v. Bornhorst, 513 F.3d 503, 515 (6th Cir. 2008).

Defendants have also not demonstrated that Patterson is entitled to qualified immunity here. See id. ("[A]n arresting agent is entitled to qualified immunity if he or she could reasonably (even if erroneously) have believed that the arrest was lawful, in light of clearly established law and the information possessed at the time by the arresting agent."). At the time of Pannell and Collins's arrest, it was well established that (1) a person's mere presence at a crime scene does not establish

9

probable cause; and (2) an arrest without probable cause violates the individual's constitutional rights.  See Parsons, 533 F.3d at 504.  In light of the clearly established law and information possessed by Patterson at the time, Patterson is not entitled to qualified immunity.  The court will deny Defendants' motion for summary judgment on Pannell and Collins's false arrest claims.

V.      **City of Taylor's Liability**

With respect to Pannell and Collins's claims, there is no basis to impose liability on the City of Taylor.  Pannell and Collins have not pointed to a City policy or custom that caused them injury. See Monell v. Dept. of Social Serv., 436 U.S. 658, 691 (1978) (no respondeat superior municipal liability under § 1983); Garner v. Memphis Police Dept., 8 F.3d 358, 364 (6th Cir. 1993) ("This circuit has stated that to satisfy the Monell requirements a plaintiff must "identify the policy, connect the policy to the city itself and show that the particular injury was incurred because of the execution of that policy.").  Therefore, Pannell and Collins's claims against the City of Taylor will be dismissed.

## ORDER

IT IS HEREBY ORDERED that Defendants' July 5, 2009 motion for summary judgment is GRANTED IN PART and DENIED IN PART, consistent with this opinion and order.


Date: February 01, 2010                     s/John Corbett O'Meara
                                            United States District Judge


I hereby certify that a copy of the above order was served upon counsel of record on this date, February 01, 2010, by electronic and/or ordinary mail.


                                            s/William Barkholz
                                            Case Manager